**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Criminal Action Number** |
| ) | **15-00301-CR-W-GAF** |
| **Lashone Gates,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS STATEMENTS (Doc. #29) filed on February 15, 2016, by defendant Lashone Gates ("Gates"). On April 12, 2016, the undersigned held an evidentiary hearing on Gates' motion. Gates was present and represented by his counsel, Adam D. Fein. The government was represented by Assistant United States Attorney Catherine Connelly. At the evidentiary hearing, one witness testified: Detective Greg Harmon with the Kansas City, Missouri Police Department. Additionally, the following exhibits were admitted into evidence without objection from the parties:

| Number | Description |
|---|---|
| Gov't. #1 | Arrest video |
| Gov't. #2 | *Miranda* waiver form |
| Gov't. #3 | Interview video |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. Greg Harmon is a detective with the Kansas City, Missouri Police Department assigned to the Vice Unit. Tr. at 4.

2. The Vice Unit investigates crimes such as prostitution and, on occasion, employs covert prostitution and undercover decoys, including the placement of decoy advertisements on the internet. Tr. at 5.

3. On January 29, 2014, Det. Harmon was assigned to an investigation regarding an advertisement for escort services that was posted by the police department on a web site named backpage.com. Tr. at 5-6.

4. In response to the advertisement, Gates contacted the advertised phone number and engaged – unbeknownst to Gates – in a conversation with an undercover female police officer. Tr. at 6.

5. After the undercover female police officer informed Gates that she was 15 years old, Gates agreed to meet the "girl" at a Sleep Inn motel in Kansas City. Tr. at 6.

6. When Gates arrived at the designated room at the Sleep Inn, he was arrested. Tr. at 7; Gov't Ex. No. 1.

7. Approximately 40 minutes after being arrested, Gates was interviewed by Det. Harmon in the Sleep Inn motel room. Tr. at 8.

8. In addition to Det. Harmon, Dave Kellgren (another detective with the Kansas City, Missouri Police Department) was present for the interview. Tr. at 9.

9. During the ensuing 40-minute interview, the three men were seated in the room, although Gates was handcuffed. Tr. at 9-10.

10. At no point during the interview did Gates appear to be impaired or lack an understanding of what was transpiring or experience any difficulty in understanding and communicating with the officers. Tr. at 11.

11. Prior to Det. Harmon's questioning of Gates, the officer advised Gates of his *Miranda* rights asking Gates to read along on a pre-printed *Miranda* form while Det. Harmon read the rights out loud. Tr. at 11-12; Gov't Ex. No. 2.

12. Following the reading of the *Miranda* rights, Det. Harmon asked Gates if he understood the rights and Gates affirmatively stated that he did. Tr. at 20; Gov't Ex. No. 2.

13. Thereafter the following exchange occurred between Det. Harmon and Gates:

> Det. Harmon: *Having these rights in mind, do you wish to talk to us now?*
>
> Gates: *No, I don't have nothin to say right now.*
>
> Det. Harmon: *Do what?*
>
> Gates: *Don't have nothin to say.*
>
> Det Harmon: *You don't have nothin to say or you don't want to talk to us? I don't know what you mean by that?*
>
> Gates: *I* [inaudible] *what you're talking about.*
>
> Det. Harmon: *Well I mean what we want to talk to you about is how you ended up here. What you got going on here?*
>
> Gates: *I don't really have nothin' going on here. Like I said I got family here so I was already visiting my cousin.* [Inaudible] *Like I said a lot of the time I talk to girls they be lyin . . . .*

Gov't Ex. No. 2, 3.

14. Gates then proceeded to make incriminating statements over the next 30-35 minutes in response to questioning from Det. Harmon. Tr. at 15, 18; Gov't Ex. No. 2.

**PROPOSED CONCLUSIONS OF LAW**

In his motion to dismiss, Gates raises a single issue, namely that the statements he made to Det. Harmon during the interview on January 29, 2014, were obtained in violation of his constitutional rights. It is true that with regard to Gates' statements to Det. Harmon, the Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement
> that the [government] which proposes to convict and punish an
> individual produce the evidence against him by the independent
> labors of its officers, not by the simple, cruel expedient of forcing
> it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S. Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from
> testifying <u>voluntarily</u> in matters which may incriminate him, . . .
> for those competent and freewilled to do so may give evidence
> against the whole world, themselves included. . . . Indeed, far from
> being prohibited by the Constitution, admissions of guilt by
> wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S. Ct. 1814, 1818 (1977) (*emphasis added*). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures

which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26.

With regard to the January 29, 2014 interview with Det. Harmon there is no dispute that Gates was interrogated and was in custody at the time of the interview. Moreover, there is no dispute that Gates was apprised of his *Miranda* rights prior to making any incriminating statement. Finally, there is no contention by Gates that his statements were the product of coercion or a failure to understand and appreciate his rights. Instead, as explained by Gates' counsel at the suppression hearing, the lone issue is very narrow:

> The only issue is whether or not [Gates] invoked his right [to remain silent] unequivocally and whether or not it's something that was scrupulously honored.[1] It has nothing to do with coercive tactics, lighting, [or] how many people were in the room.

Tr. at 10.

In the context of invoking the *Miranda* right to counsel, the Supreme Court previously held that held that a suspect must do so "unambiguously." *Davis v. United States,* 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994). In so ruling, the Court noted that if an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no

---

[1] In general, if a suspect invokes his right to remain silent after receiving *Miranda* warnings, interrogating officers must "scrupulously honor" the right. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 326 (1975).

5

statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights. *Id*. at 461-62, 114 S. Ct. at 2356. *Davis*, however, did not address a suspect's invocation of a right to remain silent. In 2010, though, the Court extended the rationale of *Davis* to the right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 2259-60 (2010) (finding that "there [was] no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*").

In *Thompkins*, the Court concluded that there were sound reasons "to require an accused who wants to invoke his or her right to remain silent to do so unambiguously." *Id*. at 381, 130 S. Ct. at 2260.

> A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong." Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation. But as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.

*Id*. at 381-82, 130 S. Ct. at 2260 (*citations and internal punctuation omitted*).

The Court's approach in *Thompkins* was in accord with pre-2010 Eighth Circuit case law regarding invocation of a right to remain silent. Specifically, the Eighth Circuit has held that "[a] suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'" *United States v. Ferrer–Montoya,* 483 F.3d 565, 569 (8th Cir. 2007) (*quoting, in*

*part*, *United States v. Thompson,* 866 F.2d 268, 272 (8th Cir.1989)). Consequently, "[i]ndirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda.*" *Ferrer–Montoya*, 483 F.3d at 569. Moreover, the Eighth Circuit has held that a defendant's evasive or reluctant behavior is insufficient to invoke the right to remain silent. *Id.*

The linchpin of Gates' argument rests upon his contention that he unequivocally invoked his right to remain silent during the initial exchange with Det. Harmon:

> Det. Harmon: *Having these rights in mind, do you wish to talk to us now?*
>
> Gates: *No, I don't have nothin to say right now.*
>
> Det. Harmon: *Do what?*
>
> Gates: *Don't have nothin to say.*
>
> Det Harmon: *You don't have nothin to say or you don't want to talk to us? I don't know what you mean by that?*
>
> Gates: *I [inaudible] what you're talking about.*
>
> Det. Harmon: *Well I mean what we want to talk to you about is how you ended up here. What what you got going on here?*
>
> Gates: *I don't really have nothin' going on here. Like I said I got family here so I was already visiting my cousin. [Inaudible] Like I said a lot of the time I talk to girls they be lyin . . . .*

The Court concludes[2] that Gates' statement were insufficient to constitute an unambiguous invocation of his right to remain silent.

In reaching this conclusion, the Court notes that the Eighth Circuit has found that no invocation of right to remain silent occurs when a district court "merely f[inds] that [a defendant]

---

[2] The question of whether a suspect invoked his right to remain silent is largely a factual determination for the Court. *United States v. Cody*, 114 F.3d 772, 775 (8th Cir.1997).

'declined to answer questions' during the time at issue." *Ferrer-Montoya*, 483 F.3d at 569. Indeed, other district courts in the Eighth Circuit, relying on *Ferrer-Montoya*, have found no invocation of a right to remain silent when considering statement closely akin to the language employed by Gates. For instance, in *United States v. Yodprasit*, 2016 WL 1069671, slip op. (N.D. Iowa Mar. 17, 2016), a suspect told his interrogator "I've got noth'n else to say—what I've already told you guys is what I wanna say." *Id*. at *5. The court found that the "statement was not a clear, consistent expression of a desire to remain silent," but "[r]ather, it was an equivocal statement under the circumstances insufficient to invoke the right to remain silent." *Id*. The court further noted that "[b]eing evasive and reluctant to talk is different from invoking one's right to remain silent." *Id*. (*quoting Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001)).

Similarly, in *United States v. Ravensborg*, 2013 WL 5565891, slip op. (D. Minn. Oct. 8, 2013), a suspect argued that he invoked his right to remain silent when he told an officer "Well, I really have nothing to say." Id. at *2. The court, however, found:

> On its face, the statement is neither a direct nor explicit statement that Defendant wanted to stop the interview and remain silent. Rather, the statement is susceptible to multiple reasonable interpretations.

*Id.* at *3. Finally, in *United States v. Williams*, 690 F. Supp. 2d 829 (D. Minn. 2010), a suspect told an officer "I'm done answering questions, I'm sorry, goodbye." *Id*. at 836. The officer then responded, "You're done?" and the suspect answered, "Yes," but, without pause, quickly launched into a monologue explaining her situation and claiming "I didn't do anything." *Id*. The court found that the "[d]efendant did not unequivocally invoke her right to silence during an interrogation." *Id*.

Having determined that Gates did not invoke his right to remain silent, however, still leaves the related – but separate issue – of whether Gates waived his *Miranda* rights. In *Thompkins*, the Supreme Court noted that:

8

> Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily waived *[Miranda]* rights" when making the statement.

*Thompkins*, 560 U.S. at 382, 130 S. Ct. at 2260 (*quoting*, *in part*, *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757 (1979)). The waiver inquiry "has two distinct dimensions," to wit: the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine,* 475 U.S. at 421, 106 S. Ct. at 1141.

In establishing a waiver of the *Miranda* right to remain silent, the Court in *Thompkins* made it clear that "the prosecution . . . does not need to show that a waiver of *Miranda* rights was express." *Thompkins*, 560 U.S. at 384, 130 S. Ct. at 2261. Rather, "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Id*. To that end:

> Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

*Id*. 560 U.S. at 384, 130 S. Ct. at 2262. In this case, there is no claim of coercion nor lack of understanding regarding the *Miranda* warning given to Gates. Consequently, the Court concludes that the Government has established a valid implied waiver and suppression is not required.

Accordingly, it is

9

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS STATEMENTS (Doc. #29) filed February 15, 2016.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                  */s/ John T. Maughmer*
                                                  **John T. Maughmer**
                                          **United States Magistrate Judge**